May it please the court, in every context where the government expressly divides people into suspect classes declaring that race matters most, the court's decision is immediately suspect and presumptively unconstitutional. Separate is inherently unequal. The district court in this case abused its discretion because it failed to place the burden on the government. Second, because it failed to apply strict scrutiny. And third, because it failed to accept the plaintiff's unrebutted facts. Since the government cannot survive strict scrutiny, we ask the court today to reverse the district court's denial of a preliminary injunction and to avoid delay, issue that preliminary injunction itself. I'd like to make three main points today. First, that as I've said, the government cannot survive strict scrutiny, which applies here. Secondly, that there is no theory or doctrine that exempts the government from the Title VII in Washington law against discrimination ban on race discrimination. And third, that there is irreparable harm here, that the state's unwritten racially based policy still continues. There's one just preliminary matter that I think I would at least like you to address. So as I understand it, the district court, well, under the federal rules, the district court is supposed to give a reason for either granting or denying injunctive relief. And the district court did that here. And as part of that, he made a statement, which I construed essentially as a finding, that there was no ongoing policy, that this incident occurred over a weekend, and that there was miscommunication by those who were involved. What do we do with that? I think that that finding was an abuse of discretion and ignores unrebutted facts by the plaintiff. There were a series of declarations filed by the plaintiffs, which were unrebutted, that long after this weekend, the state was … Well, there was your series of declarations that were submitted, and then there were the declarations that they submitted in opposition to the motion by the managers that were involved. The names are slipping me at the moment. I can't remember all these names, but there were quite a few names. But there were some management declarations, and the district court read and considered them. And under the rules, there was no evidentiary hearing. The court can rely on the declarations. It can draw inferences and whatnot to the extent there's enough statements in the declarations. And he did that here. So, I mean, how can we just say he abused his discretion? Your Honor, I would draw your attention to the person identified by the state as the decision maker, the senior management nurse, Lila Rooks. In her declaration, she said, I made this decision. And on ER 73, she said, I would do it again. So? That means, and let me add to that, that the state has the same patient who has a destabilizing condition. There are numerous patients in this hospital for which there is assaults that they are engaged in. And the state has said the only tool in its toolbox to deal with this problem is to do the same thing over again. I submit to you that there is an ongoing, unwritten policy. Whether it is implemented any given day is a separate matter. And I would draw the court's attention to the U.S. But the district court listened to all that evidence, or listened to it, read all that evidence, and decided contrary to your position as a matter of fact. It may be erroneous, but it sure don't look clearly erroneous. I think the only thing. And we're not talking about summary judgment. I mean, well, we've got evidence on the other side. It's kind of irrelevant, isn't it? Indeed. The state of Washington has said, we have selected employees to who can work with whom based on their race. Well, you're saying, you know. Go ahead. Go ahead, Judge Fernandez. That's really rather overstating it, is it not? I don't believe so. The state of Washington said something like, I think. Tell me where I'm wrong. If I'm running a zoo, and I've got a wild animal there who was abused by choose your race, a white person. And this animal, if a white person enters his cage or gets close to his cage for any reason, will tear him limb from limb. Right? So we're not going to send a white person in there for this animal at this point. Maybe they said that. And certainly we're not going to do it this weekend. Right? That's what we're not going to do. And I think you're saying, well, that's an unconstitutional policy on its face. And I'm having a really hard time understanding why that's so. Especially when it goes back to the McNaughton case and thinks about truly mentally disordered people as being kind of like wild animals. So what do we do with that? What should a supervisor do? Assuming my facts. Okay. What should a supervisor do in that case? A supervisor should do with the only medical testimony in the entire case. I'm not asking about medical testimony, about what one doctor says is so. I'm saying, I know what he said. He said, oh, well, send him in anyway. Tough luck. You can't let the animals run the zoo. I understand. I don't think he said that. Well, it sounded a lot like that. I think he offered. Make it worse. If you let him choose and make it worse. What should they do? They should. Faced with that situation. When faced with that situation, removing a particular person because they are the target is not a race-based decision. There's an individual by the name of Marley Mann who was specifically targeted. You misunderstood my question. I said this particular animal, and I've had a little bit of experience with a dog, for example, who doesn't like men with particular lineaments especially. He just does not. He's scared of them. Scared to death. Always been scared to death of them. I'm talking about this animal that will attack, period. So don't shift off to, well, it could have been just a one-person thing. I want you to assume that this animal will attack any person, any white person, period, white male. All the time, no matter what. That's what this animal will do. Take my facts. Don't tell me about this. Okay. What should they do then? It may well be that that person is going to have to be separated from the population through a seclusion or restraint if you're telling me that there is no other way. Separated from everybody or just from that particular, those particular kind of white people? No, because that would be a racial exclusion, and if it happened with one person, it could happen with a ward of people, and you will end up with a white ward because those people hate. This policy fosters racism. I understand what you're saying. And what I'd like to draw the Court's attention to is the decision in Johnson v. California in which the U.S. Supreme Court said strict scrutiny always applies. Well, there was a clear policy there that was ongoing, the way they classified new inmates into the prison system. It was a clear, ongoing, defined policy about how they were going to initially assess newly convicted prisoners. Well, it was an unwritten policy. But it was clear. There was no dispute about what the policy was. And I think that works against the state of Washington here. We have the e-mails that show that staff were clearly instructed, e-mails by their senior staff, that several days before the weekend they were instructed to not have any black employees deal with this patient until further notice. There is no corresponding e-mail or documentation ever showing that it was ended, and the best that the state can come up with is a single statement two and a half months after the event saying there is no, quote, current policy like this. And you weigh that against the plethora of evidence submitted by the plaintiffs, I think it is clearly erroneous for the Court to just declare that there is no policy based on that slim, slim read. Would the state be opening itself up to liability? Let's say they had decided not to adopt the policy they did that particular weekend in something that actually happened to an African-American employee. Would they then be opening themselves up for liability for being aware of a known risk and putting that employee in harm's way? The state has argued that this is the most dangerous place to work in the state of Washington. There are assaults happening every day. The state does not make the argument that it is liable for all of those assaults. The U.S. Supreme Court in Johnson Controls said you may not have a bona fide exclusion for women from working with lead based on your fear that they may sue you someday because they cannot have children. So I don't think that the state can refuse, can engage in racial segregation because it's afraid of being sued. Even if it's a particular threat? If it's a particular threat to a particular person, yes. Isn't that really what happened here? Isn't that what they were concerned with here? They were concerned. And according to the district court, it just sort of became, it sort of took a different turn when people perceived what the directive was. I think they were concerned with racial violence, but as the court in Johnson v. California said, that's not enough. And the phrase narrow tailoring shows up nowhere in their briefs. They have essentially conceded that they considered no other alternatives, whereas we have provided a series of alternatives through Dr. Geller's unrebutted testimony. So let me take another step. So, you know, the first test of a preliminary, under a preliminary injunction analysis is substantial likelihood of prevailing on the merits. We've been talking about that in the constitutional setting. But where's the irreparable harm here? The irreparable harm, to put it bluntly, is that every day that my clients come to work, they know that there is an unwritten policy that should one of the patients, and it will happen, express racial enmity, that they at any day may be told to stand there and compare their arms and choose whoever is lightest, making race what matters most. It is, in essence, the harm that Rosa Parks suffered. She got a ride on the same bus to the same location she was headed, but it is not the same sitting in the back of the bus. And my clients are faced with that. The white clients must go twice as often to work with this dangerous patient, which subjects them to an increased risk of assault. I would finally just add, in the Title VII context, there is a line of cases, including from the Ninth Circuit, which holds that the harm to esprit de corps, to racial harmony in the workplace, is itself a recognized harm. And the Ninth Circuit- Actually, let me ask you. Yes. After Winter v. NRDC, the Ninth Circuit has issued a lot of decisions that there's no longer a presumption of irreparable harm. And you argue that in this context, Title VII, equal protection, that there should be a presumption. But how can that be after NRDC and the long line of cases that are now saying you can't have a presumption? We would argue that under the Winter standards, there is a probability of harm here because the state has said it will do it again. And the Attorney General's Office, which represents the executive, has said we need the flexibility to do this again, and because the state has not shown that it will handle this in any other way. They've not said, when this arises again, we will take some different step. They have identified racial segregation as their only tool. If I may, I have very little time. I would like to- Yes, you can save the balance of your time for rebuttal. Thank you. We'll raise this up just a hair. Good morning, Your Honors. Andrew Lagerwell, Assistant Attorney General on behalf of Western State Hospital, Dr. Mary Louise Jones, and Dale Thompson. This case centers not on a race-based decision where race mattered most, but on a safety-based decision where personal safety, in light of years and years of history of assaulted behavior by a physically large, decompensating patient who refused to take his medication. It was a staffing directive that lasted a single weekend. It covered one out of eight wards. It covered one out of 22 patients, and it covered one out of three shifts. Plaintiffs have argued that the unrebutted evidence was that- Wasn't the safety decision to enforce a race-based policy? It's a little bit odd to say there's a dichotomy here between safety and race. They were the same thing in this instance, according to the hospital, no? No. Unlike cases like Johnson v. California, Lee v. Washington, where safety and race were coupled, where what the prison was saying is there's something endemic, there's something about African Americans that they create a race-based threat of harm to- I think in Lee it was Hispanics- that if not segregated, cannot be controlled. In this case, the safety concern was based on the patient's history of assaulted behavior, and the patient's explicit- If you look at the Declaration of Andrew Prisco, where he says, we will remove 5,000 trillion African Americans every second. But the hospital's response was to segregate. No, I disagree with that. I think the hospital's response was to remove people from harm's way. They didn't segregate in that they didn't say African Americans can't be PSAs, that African Americans can't work on Ward F8 where the patient lives. As a matter of fact, Andrew Prisco says that during all three shifts, there were African Americans on that ward generally. But that with this particularly highly disturbed, unmedicated, highly assaulted patient, for this one weekend, until we can get his primary caregiver back together and assure the safety of our employees, we will not have these people working one-to-one with this one particular patient. Well, how is that not segregation with regard to that patient, though? I think when you look at all the cases, the line of cases where you talk about segregation, Brown v. Board of Education, Johnson v. California, Lee v. Washington, they segregated entire classes of people based on misconceptions about the characteristics of those persons. For example, in this particular case, I don't think you would say it was baldness discrimination if the patient said, I will harm the next bald person that comes within arm's reach, the next person with glasses, the next person over six foot, nothing personal. Please, please. We developed that one during practice sessions. I apologize for carting it out right now. You just lost the whole bench. Yeah, exactly. But nonetheless, it wouldn't be necessarily that what the focus is that African Americans can't provide quality care, that there is something endemic about those. It's just like Johnson controls. It's basically discriminating based on a, some might say, sort of patronizing or that you need protection and we're going to make the judgment that you can't handle this particular situation. We're not saying that you're a bad PSA or that you're not capable of being a PSA, but we're going to make the decision that for your safety, we need to exclude you. I would disagree that Johnson controls. Again, it's, if you look at the, I mean, one of the cases that we tied to says you have to take it in context of the work situation, the workplace as a whole. Over the four years prior to September of 2010, this particular patient had committed 70 assaults, put people in the hospital. There were people still out on LNI at the time this injunction was brought. After September until April, they had found a behavior management plan that had kept him free of assaults and out of restraints. He had been in restraints and seclusion for over a year. He stopped taking his medication, a pattern the hospital has seen before. He starts decompensating and he articulates specific threats, threats that are, in one instance, based on an individual that was identifiable, Marley Mann, and I don't think Marley Mann, who's not a plaintiff to this lawsuit, could really bring a class of one lawsuit, saying, hey, look, I was discriminated against because I'm me, right? And so, additionally, what the hospital ended up doing, unlike in Johnson, where it said there is something about the characteristics of these people that the African-Americans, for example, if we put them with this particular patient, would somehow provoke him. If that was the determination, then I would agree with Your Honor that Johnson would control. But in this particular case, it also helps to look at the language of the inquested injunctive relief. They wanted the Western State Hospital, as a whole, to be precluded from enforcing any policy or practice that segregates or assigns workers at Western State Hospital by race. The court, acting well within its discretion, as Your Honors noted, found two important facts. A, that it was a safety-based, not a race-based decision, and B, that it was a decision that lasted a short time. To the extent that any evidence was unrebutted, it was because the plaintiffs included two declarations in their reply brief that had two of the plaintiffs saying on five instances they believed their assignments were based on race, although they had no direct evidence supporting any of those considerations. The review that this court engages in is a highly deferential review of use of discretion because an injunction, especially the injunction in this particular case, is such an extreme remedy. I want to correct one thing. Plaintiffs' counsel said that factual findings are reviewed for abuse of discretion. Under controlling case law, they're actually viewed, under Park Village, for instance, for a clear error in that they must be illogical, implausible, or without supporting evidence on the record. If we agree with the... or if we conclude that the district court's finding there is not clearly erroneous, does that result in an automatic affirmance? Given the posture of this case, I would say yes, because... Because they're seeking what? Because they're seeking preliminary injunctive relief and that means there's no showing of an ongoing policy? Right. What they say is that because there is past constitutional harm, an instance that occurred in the past, that it is irreparable in the future. The problem with that argument, in light, again, of the totality of the circumstances of this case, there is no evidence that this has ever occurred in the history of the Center for Forensic Studies. There is no evidence from any source that there has ever been the need prior to this patient... Based on this record. Based on this record. Right. Including from some of the patients who... or from some of the plaintiffs who express having been there for years and years and years. They can't say, this is the kind of thing that happens all the time. And I think that's the ire they raise by saying that this is the only tool in the toolbox. Clearly, that's not true. The Center for Forensic Studies has existed for years without there being any evidence that they've had to use this quote-unquote tool in the past. Is the analysis any different under Title VII than under the 14th Amendment? It is. How is that? Under Title VII, what the plaintiffs, I think, based on the way they've teed this case up in front of the district court would have to show that we had a bona fide occupational qualification that was based on race. And there's absolutely no evidence that that's the case. There's no documents. There's no testimony that at any point the hospital said people of African-American descent can't be PSAs or can't even work with this patient. Does the CFOQ analysis apply to race classifications? It does if the bona fide occupational qualification is a race. And I mean, yes and no. Yeah, that would be part of the case. No, I don't think Title VII allows for you to make race a BFOQ, as plaintiffs have argued. I think that is correct. But in this case, there's no evidence that race was ever made a BFOQ, either temporarily or permanently. The unrebutted evidence is that come Monday, April 4th. So under Title VII, there still has to be some harm to the employee, correct? That is correct. Under the regular Title VII analysis, first they'd have to show that there was some form of invidious race-based discrimination that resulted in actionable harm that we don't have here. The thing you've got to remember is that what we're talking about is eight wards on a hospital. These employees went to the ward they were regularly assigned to, Ward F5, and absent a shortage caused by the need to remove Marley Mann because of the specific threats, they would stay and would work. It's only when there's a shortage in one of the other wards that somebody is pulled off the pull list. So in this particular case, they worked where they normally would have worked, they worked the same hours they would have worked, they received the same pay, they received the same benefits. There has been absolutely no adverse employment actions as you would normally see. I think that raises an interesting point, which is that Title VII was created originally in order to erase invidious employment discrimination. Those acts where the employer says, you, this whatever category of employees, you are unable because of something about who you are to perform these particular functions. So we're going to make this class of jobs, these promotional opportunities unavailable to you because of our preconceived notions about you based on race. That just didn't happen here. Out of the team of five caregivers assigned to this patient, two of them were African American. By Monday, April 5th, he was back to working with his African American caregiver, Eddie Griffith, and continued to do so. So the notion that somehow this is that invidious state-sponsored segregation is just not borne out by the record, which leads to Your Honor's question about the constitutional analysis. This is not like Brown v. Board of Education. This is not like Lee v. Washington or Johnson v. California where there were these broad-based prescriptions,  based on the race of individuals. What would you do with the statement that the supervisor said, if it happened again, I'd do the same thing again? What the supervisor, her name is Lila Rooks, actually said is the practice at Western State Hospital is any time a patient focuses on a particular person, regardless of why, glasses, red hair, ties, too tall, whatever it is, we remove that caregiver for that caregiver safety. Lila Rooks did not say we would do this again as our quote-unquote only tool. With this particular client, he had spent over a year in segregation and mechanical restraints as a form of dealing with his assaulted behavior. So clearly there are other tools in the toolbox. Could the hospital use a classification system to, if there was a pattern, a past, let's say, some prior incidents involving African-Americans who were attacked by a particular patient on a regular basis, could they adopt a policy that we're not going to let African-Americans? With an individual patient? Yeah. I don't think so. I think you would be hard-pressed to say that we could have a permanent, ongoing policy that, because then you're playing right into what happened in Shady versus Plainfield Medical Center, where the individual patient said, we prefer to have Caucasian caregivers, and so that became the standing order for all time, was in order to bow to that preference they would allow. Even where there's been instances where the patient has, you know, attacked, I mean, you could change it. You could say sex, you know, females. Send a female in there to take care for the patient. You know, there's a pattern of attacking the female caregiver. Yeah, I mean, I think if you... And so the hospital says, well, you know, this is... Simply not working. This is not working out here. We're only going to send males in there. I think it would be, I mean, I think of what Your Honor is saying, is the hospital is almost guaranteed to a certainty that any time they put an individual of, regardless of what characteristic, within arm's reach of a highly assaulted patient, the history of over 70 assaults over a four-year period, and that person always assaults the same characteristic of person, I think the hospital would be in a difficult situation, but I think that legally, yes, if it was as narrowly tailored as possible. So maybe there's other alternatives they could do. Apparently they had this particular patient in some sort of physical restraint for quite a while. Seclusion and restraints, I mean, but at a certain point, because you've got to remember, this is not the Department of Corrections. Right. These are patients at a mental health facility, and you cannot just constitutionally, because they have rights as well, you cannot lock them up indefinitely. So the hospital has to have a plan of treatment for somebody in this particular patient's category. Correct, and that's primarily what Dr. Geller takes umbrage with, which is the treatment plan that's been developed in order to reduce the amount of assaults this patient is inflicting upon staff and fellow patients, as well as to keep them out of mechanical restraints and seclusion. I think one of the reasons we didn't need to address Dr. Geller's opinion is it's completely irrelevant as to whether or not this particular decision at issue was A, based on race, and B, was continuing and ongoing, especially in light of the injunctive language requested. And secondarily, it's not borne out by the record. I mean, Dr. Geller is saying this is an ineffective way, and it's a dangerous way to manage this patient, but up until we came up with the treatment plan we did, he committed a number of assaults, and then between that time and this injunctive he committed none, stayed completely free of mechanical restraints. So even if that was to somehow be relevant, I think it's not borne out by the record. Okay. I have only a short time left, and I guess I'll close with the following. The injunction was all or nothing. It would completely hamstring in a number of hypotheticals, one of which the judge brought up when he talked about the balance of hardships in the public policy, from reacting to specific known threats of harm to individuals if that threat was based on race, if it was based on any other characteristic the hospital could manage it. The following hypothetical came to mind when we were looking at this case. If you had an employee who barred himself in his room and said, I will attack the next tall person or the next African American who comes in the room, the next two PSAs are one tall, one African American. The tall one says, based on the history of assaults and what he's telling, I don't want to go in there. The hospital will say, you may go. If the African American said, based on his specific threats and his history, I don't want to go in there, under the language of this injunctive relief, the hospital will say, I'm sorry, we're precluded from allowing you to stay out of harm's way by a federal injunction. You're going to have to go in that room. The court was well within its discretion in ruling that plaintiffs should fail to satisfy any of the four prongs of the winner's test, and we ask that this court affirm. Thank you for your time. Thank you, counsel. Thank you. Thank you, Your Honor. The defense just told you that it would completely hamstrung their operations if you precluded them from using race as a factor in their decision making. That strongly suggests, as we've pointed out here, that that is a serious tool that they intend to use. You asked whether the winter analysis would allow what we propose. What I think the winter case stood for was that possibility of irreparable harm is not enough, but probability is, and a presumption under Title VII can meet the probability standard. But if the presumption is being eliminated in copyright and patent and all these other contexts, what is so special about Title VII that would allow the presumption to continue just for those cases? Race is different. There is no bona fide occupational qualification under Title VII. Race is different. It's the suspect class. There is no suspect class under patent law. If I may. Is there any post-winter authority that supports the presumption continuing for Title VII cases? I am not aware of any. I'm not aware of any contrary authority either, but I'm not aware of any. On ER 73, Lila Rook stated, and I quote, in retrospect I would make the same decision today. Those are the facts that the district court was looking at. I also think that this concept of for all time is really misleading, that unless the state said this is how we're going to do it forever, that's simply not the law. And it was quite clear that in the Monterey case issued by this court, race discrimination is not a trifle. There are no de minimis examples of race discrimination. Whether you believe it happened for a weekend, which we don't think the court can truly believe, or whether you think it lasted for a period of months, which we think the evidence shows, this court's obligation is necessarily to come forward and tell the state of Washington what it may or may not do. And every day my clients go to work wondering whether today they're going to pull this out of the toolkit. And we think that that violates the core function of the hospital, which is to provide treatment to patients consistent with the standard of care. And the only medical testimony in the record says it's contrary to care, it's bad hospital policy. You're over your time. Oh, I'm sorry. I misread the clock. Thank you. Thank you, counsel. Thank you, counsel on both sides. We appreciate your arguments. Interesting case. Matter is submitted. That ends our session for today.
judges: Koh, Fernandez, Paez